## HENRY H. APLIN, AUDITOR GENERAL, v. JAMES M. VAN TASSEL, TREASURER OF TUSCOLA COUNTY.

*Taxes—Collection of State tax by county treasurer—Mandamus—Accounting—Set-off.*

1. The tax law of 1885 requires the payment by the county treasurer to the State Treasurer of all State taxes he may collect, which payment he cannot refuse to make on the ground that the county claims to have money due it from the State; nor will he be protected by the action of the board of supervisors directing such non-payment.

2. The following propositions are summarized from the opinion of Mr. Justice CAMPBELL:

*a*—No doctrine is better settled than that the State cannot be compelled to respond in any court, unless it has conferred such a privilege on suitors.

*b*—What we are asked to do is to consider, in a suit on behalf of the State, which could always sue in its courts to enforce its rights, a counter-claim which, in a suit by individuals, could at best be put in as a set-off, which is neither more nor less than a cross-action allowed by statute, and only by statute, to be put in under a plea, instead of by an independent suit. There is no authority in any officer or agency of the State to subject it to any such proceeding.

*c*—A set-off is as direct an exercise of affirmative jurisdiction as a suit; and a *mandamus* in a case where the duty of a public officer is absolute and specific, to pay over public moneys, is no more matter of discretion than any other remedy. Courts cannot refuse to enforce absolute rights.

*d*—In those cases where this Court has refused to compel taxes to be collected by *mandamus*, it has always been where all or a part of the claim is not warranted by law.

*e*—The State tax is levied upon the individual tax-payer for the direct benefit of the State. The county treasurer, in making the collection, acts, so far as the State taxes are concerned, for the State, and for no other body; and the board of supervisors have no more control over the money thus collected than if it were in the State treasury.

*Mandamus.* Submitted October 18, 1888. Granted November 28, 1888.

Relator applied for a *mandamus* to compel respondent to pay over State taxes. The facts are stated in the opinion.

*Moses Taggart,* Attorney General (*R. W. Butterfield,* of counsel), for relator, contended for the doctrine laid down in the opinion.

*T. W. Atwood,* for respondent, contended:

1. The illegality of the charges for losses to the State on the sale of State tax lands and the interest thereon, under the 1869 law, will not be questioned; citing *Auditor General v. Supervisors,* 62 Mich. 579.

2. In this case, where the State sues the county to recover money claimed to be due from it or its officers, any defense may be interposed that could be set up in suits between individuals; citing *Ambler v. Auditor General,* 38 Mich. 746.

CAMPBELL, J.    The treasurer of Tuscola county, having received the State taxes for the year 1887, refuses to pay them over, and bases his refusal on the orders of the board of supervisors of that county, who insist that the State owes the county on some old accounts, where the county had been charged beyond its legal obligation to the State.

The answer to the order to show cause, granted in this case, admits the receipt of the State taxes for 1887 by respondent, as claimed by the State, and admits he refused to pay over. But he attempts to justify the refusal by a resolution of the supervisors, which, after a preamble asserting that the State had a large amount of money in its hands belonging to the county, proceeded as follows:

"*Resolved,* therefore, that the treasurer of the county of Tuscola be, and is hereby, instructed and directed not to pay to the State any further sum or sums of money until the State shall give to the county of Tuscola, in the accounts between the county and the State, credit for

the sums illegally and unjustly charged the county for interest, and taxes charged back for, under section 124, Act 169, Laws of 1869."

The respondent sets up, as referred to in this resolution, that the Auditor General, in his annual settlement of the county's account with the State, included in what was charged against the county various sums from 1870 to 1875, for losses to the State on the sale of State tax lands, and interest thereon, under the statutes of 1869, amounting, as he claims, in the aggregate, to more than $24,000. There are also some vague general assertions of overcharges not specified in any distinct way.

The Attorney General demurred to the answer as raising questions which this Court cannot determine in this way, and the hearing is on the demurrer. The main question before us is whether this Court can enter upon the office of settling accounts between states and counties, and whether a county treasurer can refuse to pay over money which he has collected for the State, on the ground that the county claims to have moneys due it from the State. It cannot be seriously claimed that the board of supervisors can give him any power in the matter.

In our opinion, the county treasurer has no such power, and cannot be protected by the action of the supervisors, or by his own claim, to that effect.

The statute under which this money was collected makes it the express duty of the county treasurer to pay over all State taxes that he receives. It expressly forbids the mingling of accounts and payment of balances, as it may seem good to the county treasurer. By section 77 of the tax law of 1885, the county treasurer is required four times a year, on the first days of January, April, July, and October, to make a statement of the mutual accounts as they appear on his books to the Auditor General. At

the same time he is required to pay over to the State Treasurer—

"All moneys in the county treasury collected for State taxes assessed in the several townships of his county."

By the same section the Auditor General is to make quarterly accounts between the State and county, and draw his warrant on the State Treasurer for, any moneys due the county.

There is nothing in the law which allows either the State Treasurer or county treasurer to mingle the accounts, and pay over merely balances. The county treasurer must pay over all that he collects, as moneys belonging directly to the State, and not to him or to the county. The only power of the State Treasurer is to receive money as it is paid in, and to pay out money on Auditor's warrants. The duties are specific, and not discretionary.

No doctrine is better settled than that the State cannot be compelled to respond in any court, unless it has conferred such a privilege on suitors. In regard to money claims and debts, there was never any law in Michigan giving courts jurisdiction over them. Prior to the Constitution of 1850, the Legislature had full control over the subject, and habitually audited claims, until it created a Board of State Auditors, which partially relieved it. That Constitution provided that—

"The Secretary of State, State Treasurer, and Commissioner of the State Land-office shall constitute a Board of State Auditors, to examine and adjust all claims against the State, not otherwise provided for by general law." Article 8, § 4.

There is no law which gives power to courts to examine into any such claims. All the general laws place the auditing of claims elsewhere. Even in regard to claims against counties, the old appellate power of the courts was taken away by the Constitution.

What we are asked to do is to consider, in a suit on behalf of the State, which could always sue in its courts to enforce its rights, a counter-claim which, in a suit by individuals, could at best be put in as a set-off, which is neither more nor less than a cross-action allowed by statute, and only by statute, to be put in under a plea, instead of by an independent suit. There is no authority in any officer or agency of the State to subject it to any such proceeding. There is no form of action in which such a counter-claim as is relied on here is regarded as in the nature of a defense, in the proper sense of the term. It is attempting to oppose an alleged old claim against the State to its collection of a new one entirely independent, and to make a general balance apply in reduction of a specific demand. That could not be done in any case between individuals, except by statute. Such a claim would not be a valid tender on a debt, and could not be applied as payment except by agreement. Independent claims can always be disposed of separately, and must be where no statute provides otherwise.

This case cannot be distinguished, in principle, from that of *Ambler v. Auditor General*, 38 Mich. 746. That was an application to compel the Auditor General to have paid over to Gratiot county certain amounts which were analogous in their nature to those claimed here. If we had power to audit and settle these accounts in the present case, we certainly had there. A set-off is as direct an exercise of affirmative jurisdiction as a suit. And a *mandamus* in a case where the duty of a public officer is absolute and specific, to pay over public moneys, is no more matter of discretion than any other remedy. Courts cannot refuse to enforce absolute rights.

In those cases where this Court has refused to compel taxes to be collected by *mandamus*, it has always been, as there shown, where all or a part of the claim is not war-

ranted by law. How far we could in any case undo the action of an auditing authority in determining such a question is another matter. Courts are no more to be held omnipotent than legislative or executive bodies, and the law raises no stronger presumptions in favor of their action. Within certain limits, neither can inquire into the action of the other. That question is not very important here.

The taxes in question, which respondent holds, were not levied on any particular claim; and if they had been, the board of supervisors, without objection, actually levied them. The controversy is not even whether, had they refused to do so, we could have properly compelled them. Here the taxes were levied under a law which compels their payment, undiminished, into the State treasury, and provides that any moneys belonging to the county shall be allowed them by the Auditor General, and then by his order paid separately and fully out of the treasury to the county.

Furthermore, the moneys in question are not county moneys, and never were. The tax is laid on the individual tax-payers for the direct benefit of the State. The treasurer, in making the collection, acts, so far as State taxes are concerned, for the State, and for no other body. The supervisors have no more control over the money in his hands than if it were in the State treasury. It is a distinct trust fund, and can no more be stopped there, and devoted to county purposes, than it could be attached or garnished for the county, or for any one to whom the county is indebted. There is no point of view in which this money can be allowed to be impounded or retained in his hands which does not involve every element of a suit against the State.

It would be a very dangerous doctrine to allow the

73 MICH.—3.

revenues of the public to be tampered with while in process of realization. If such considerations can prevail in any case, they must prevail in all cases · where the treasurer should see fit to set them up. A defense which can be lawfully made, cannot be disposed of until the final hearing, and the final hearing must await the determination of issues of fact, and the lapse of time required to dispose of them in the usual course of trial. The State would soon become bankrupt if any county officer can, at his will, raise questions concerning the balance of accounts, and keep the money till they are settled.

Although the question is, in the view we take of it, not one to be settled in this controversy, it is to be remarked that the answer of respondent does not set forth what would appear to be a very necessary fact on which to base any relief. All of the items covered by the resolution of the supervisors accrued from 13 to 18 years ago. It does not appear that the regular quarterly statements required by law were not made by the Auditor General each year; and it does not appear that the similar quarterly statements of the accounts, as shown by the county books, required to be sent to the Auditor General, ever raised any such question. The petition sets up that they did not, and there is nothing in the return to the contrary. This is a matter which the county office records would necessarily show. There is no statute contemplating any settlement to be made directly and regularly between the Auditor General and the board of supervisors as a body, and nothing but some contest could call for such dealings, if anything could. Had the question been one which we felt authorized to go into, it is difficult to find anything in the return throwing doubt on the continued acquiescence of the county, or anything to overcome the effect of lapse of time.

It is further to be noted that the county is not and could not be made a party to this controversy between the State and the agent of the State to collect its own moneys. As already stated, the supervisors, who represent the county, where it is represented at all, in its business interests, acquiesced in levying this tax as a proper State tax. They have nothing further to do with it. If the State owes them, and they legally establish the debt, it must, under the statute, be drawn from money in the treasury, and not from money that never reached the treasury. If the State business can be done outside of the State business departments, and without going through the hands of the State's custodian of moneys, there could be no safety or reliance in the means devised for keeping all public affairs within constant knowledge and supervision in the State books and records.

The duty laid by law on respondent is absolute and clear, and a *mandamus* should issue to compel its performance.

The other Justices concurred.